Filed 4/27/21  P. v. Lozano CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE, | C085983 |
| Plaintiff and Respondent, | (Super. Ct. No. CM043088) |
| v. | |
| PHILLIP LOZANO, | |
| Defendant and Appellant. | |

Defendant Phillip Lozano was found guilty of multiple sexual offenses against the minor daughter of his former girlfriend.  The court sentenced him to 10 years plus an indeterminate term of 15 years to life in state prison.

Defendant contends on appeal that the court erred in instructing the jury on child sexual abuse accommodation syndrome, and that the abstract of judgment does not reflect the court's oral pronouncement of judgment.  We conclude the court properly instructed the jury, but that the abstract of judgment must be corrected to reflect the sentence imposed by the court.

1

FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged with two counts of aggravated sexual assault (Pen. Code, § 269, subd. (a)(1)—counts 1-2),[1] and three counts of lewd acts with a child (§ 288, subd. (a)—counts 3-5). The following evidence was adduced at trial.

M.A. was born in January 1997. When M.A. was in kindergarten her mother April M. began dating defendant.[2] Although they never married M.A. considered defendant her stepfather. M.A. and defendant were not particularly close.

The family moved to apartments in Oroville when M.A. was approximately seven years old and in the first grade. M.A. lived in the apartment with defendant, her mother, her half sister, her half brother, and defendant's two biological children, P.L. and S.L.

According to M.A., defendant physically abused her mother. He would also discipline the children by yelling at them, spanking them, or hitting them with objects such as a belt, shoe, or hanger. At one time, defendant's mother called Child Protective Services (CPS) to report the physical abuse.

M.A. testified that while living together defendant touched her sexually. The first incident occurred when she was in fourth or fifth grade. M.A. asked defendant for help with her homework while her mother was at work. He told her to wait in his bedroom. M.A. went into the room and waited on the bed. Defendant entered the room, locked the door, and pulled her off the bed. He kissed her on the lips and neck, and repeatedly tried to pull her pants down. Although she tried to pull her pants back up, defendant succeeded in pulling them down and he rubbed her vagina with his fingers. Defendant then pulled out his erect penis and forced her to masturbate him.

---

[1] Undesignated statutory references are to the Penal Code.

[2] Defendant was born in 1972. He is 25 years older than M.A.

Defendant eventually stopped because M.A.'s mother was supposed to be off work soon. He told her not to tell anyone because they would both get in trouble. M.A. went to her bedroom and did not tell anyone because she was afraid.

M.A. testified that defendant also rubbed her vagina on several occasions at night in her bedroom when she was in the fourth or fifth grade. At the time, M.A. shared a bedroom with S.L., defendant's daughter. S.L.'s bed was closer to the wall, and M.A.'s bed was closer to the bedroom door. According to M.A., defendant crawled on the floor to her bed and started rubbing her vagina through her clothes; she pretended to be asleep.

Defendant usually came into M.A.'s bedroom and touched her whenever her mother was working late; he did not try to touch her when her mother was in the apartment. She estimated that he touched her once a week, or every other week when he was home.[3]

One time in fifth grade, M.A. was sick and stayed home alone from school. Before leaving for work, her mother told M.A. to rest in her mother's bed so she could watch television. Defendant came home and began rubbing her vagina even though she tried to stop him.

On another occasion, M.A. was in the living room and defendant told her to go to his bedroom. She complied. Defendant entered the room, locked the door, and began rubbing her vagina through her clothes. He laid her down on the bed on her back and pulled her pants and underwear down. He placed a pillow over her face, and then penetrated her vagina with his penis and thrusted several times. Although the penetration hurt, M.A. laid there and did not resist. Afterward defendant told her he would buy her something.

---

[3] Defendant was a forest firefighter and would sometimes be gone for stretches of time during fire season.

M.A. testified that defendant had sex with her on another occasion in his bathroom when her mother was at work. Defendant lifted her up and placed her on the bathroom counter. He kissed her on the neck and mouth and pulled her pants and underwear down. He inserted his penis into her vagina and thrusted, which was very painful. Because she was so small, she did not fight back.

During this incident, M.A. saw defendant ejaculate on or near her vagina, and he then said, "Oh, shit. Go pee." M.A. urinated and noticed that her vagina was bleeding. Later, she called her mother and told her she got her period; her mother told her she was too young to get her period. Her mother then asked if anyone had touched her "down there," and M.A. said she did not know. M.A.'s mother did not follow up on M.A.'s response.

In December 2007, M.A. turned in a writing assignment that prompted her fifth-grade teacher to report the family to CPS. When CPS responded to her house, she told the social worker her home life was fine; according to M.A., defendant told the children that if they reported anything to the social worker they would be punished. No one was removed from the home as a result of the CPS report.

Sometime in 2008, when M.A. was in sixth grade, she told her mother defendant had been touching her, although she did not give specific details. Her mother accused her of lying.

M.A.'s mother then drove her to the nearby home of defendant's sister Rachel L. and left her there overnight. M.A. felt as if her mother did not care about her.

Later, defendant's mother Armida R. arrived at Rachel's house. Rachel and Armida asked what happened, and M.A. did not disclose the details of the abuse because she did not trust them. Armida threatened to hurt M.A. and her family, which scared M.A. and made her cry; she was especially worried about her younger siblings.

The next morning, M.A.'s mother returned to Rachel's house and asked M.A. if she wanted to change what she had said; M.A. told her "no." They drove back to their

4

apartment where defendant was waiting. Defendant and M.A.'s mother called her a liar and told her that she needed to change what she had said. M.A.'s mother forced her to hug defendant and apologize to him. After that, M.A. felt like an outsider in her own family, and she avoided social situations involving defendant's family.

Sometime later in 2008, she asked her mother if she could live with her father and her stepmother in Fresno. Her mother responded, "Go ahead. I don't care."

By January 2009, M.A. moved in with her father and stepmother in Fresno. According to her stepmother, M.A. had never wanted to return to Oroville after visiting for extended periods of time over school breaks; in summer 2008 she was distraught about returning to her mother's home. During that time, M.A. said she did not like defendant, but left undisclosed that she did not want to return because he was sexually abusing her.

After living with her father and stepmother for three years, in October 2012, M.A. disclosed that she had been sexually abused.[4] Her father and stepmother called the Fresno County Sheriff's office to report the abuse. A short time later, an officer responded to the home and interviewed M.A. During the interview, M.A. gave a detailed statement about the sexual abuse.

According to the responding officer, M.A. said the first sexual incident with defendant occurred when she asked him for help with her homework, and he took her to his bedroom and had sexual intercourse with her. She then described defendant sneaking into her room at night to molest her. A month after the first incident of sexual intercourse, M.A. said defendant had sex with her a second time in the bathroom. M.A.

---

[4] M.A. initially disclosed the sexual abuse to her brother's best friend, who told her brother that she needed his help. She then disclosed the abuse to her brother, although she did not discuss the abuse in detail. During a family dinner, her brother told her father and her stepmother.

described a third sexual assault incident when she stayed home sick from school. Unlike her trial testimony, M.A. reported the third incident occurred on the couch in the living room.

Following the interview, M.A.'s family did not hear from law enforcement about the case for over a year. M.A.'s stepmother finally called the Oroville Police Department in January 2014 to inquire about the status of the case. Investigator Sabrina Ostberg with the police department contacted M.A. and interviewed her on January 20, 2014.[5]

At trial, M.A. denied making up the sexual abuse allegations to stop her mother from getting back together with defendant.[6] She also denied fabricating the allegations because she did not like defendant.

Over defense counsel's objection, the prosecution called psychologist Dr. Anthony Urquiza, an expert in child physical and sexual abuse as well as in the myths and misconceptions about child sexual abuse. He did not know M.A. and was not familiar with the facts of the case.

Dr. Urquiza testified that children are typically sexually abused by someone they know rather than a stranger, and that because the abuse often takes place behind closed doors, other household members may be unaware the abuse is occurring. Dr. Urquiza further testified that children delay reporting sexual abuse for a variety of reasons, including: the child has been coerced or threatened not to report the abuse, the child still likes the perpetrator or values the relationship and is reluctant to see it end, he or she may

---

[5] During cross-examination, defense counsel attempted to impeach M.A. with various answers she gave during her initial interview with Ostberg and with later interviews she gave to other investigators. For example, although she testified that she was positive defendant's penis penetrated her vagina during the first incident in the bedroom when he covered her face with a pillow, during an earlier interview she said she was not 100 percent sure that vaginal intercourse occurred on that occasion.

[6] Several years after M.A. moved to Fresno, her mother and defendant broke up.

be ashamed of the abuse, the child may feel powerless and helpless because the abuser is an older, more dominant person. Child sexual abuse victims often try to disassociate themselves from the abuse; when they eventually disclose it they may only partly disclose the details of what they experienced. They may disclose more details as time goes on. Dr. Urquiza also testified that sexually abused children will sometimes directly deny abuse if asked, and sometimes recant their disclosures based on pressure from family members.

During cross-examination, defense counsel questioned Dr. Urquiza about child sexual abuse accommodation syndrome. Dr. Urquiza acknowledged that the syndrome had sometimes been criticized for being used as a diagnostic tool, but he noted that it was never intended to be used to diagnose whether a particular child had or had not been sexually abused.

Dr. Urquiza emphasized it was not his role as a psychologist to determine whether an accusation of abuse was true. He expressed no opinion on whether defendant had sexually abused M.A.

Defendant testified on his own behalf. He denied molesting or raping M.A. and claimed M.A. had a reputation for dishonesty. He said she made allegations against him in October 2008, but later apologized to him and admitted that she had lied.

According to defendant, in 2003 and 2004, he worked 12-hour shifts five or six days a week for a lumber company. He trained as a firefighter in 2004 and began working on a "hot shot" crew in March 2005. That work kept him away from home for long periods of time.

He admitted to being unfaithful to M.A.'s mother multiple times, and said M.A. confronted him aggressively. During these affairs, either he or April and the children would move out and he would not see M.A. for several months.

M.A. moved in with her father in either November or December 2008. Defendant and M.A.'s mother lived together until 2011, and then broke up. He was aware that M.A.

7

became angry when defendant and her mother discussed reconciling at a family party in 2012.

Defendant's sister Rachel testified that she lived with defendant's family for several months at their Oroville apartment in 2003. She often babysat all of the children, including M.A. According to Rachel, defendant worked nearly every day of the year and never looked after the children.

Rachel learned of M.A.'s accusations against defendant in 2008 when April brought M.A. to Rachel's house. Rachel then called her mother, Armida, to come over. She denied ever threatening M.A. when they questioned her about the accusations, and said her mother did not threaten M.A. during the conversation. According to Rachel, M.A.'s mother said she was a liar, and Rachel knew M.A. to be dishonest. Rachel was aware that M.A. later supposedly recanted the accusations against defendant.

Rachel further testified that after M.A. moved to Fresno and April had separated from defendant, M.A. returned with her mother to attend a party for defendant's family. M.A. became very upset when she saw her mother and defendant kissing at the party.

Rachel never saw defendant act in a sexually inappropriate manner with her own daughters, or with any other children. Several of defendant's other relatives testified similarly.

Defendant's mother Armida testified that she never threatened M.A. or her family after learning of M.A.'s allegations against her son. She also denied telling M.A. to change her story or recant the accusations. During cross-examination, defendant's mother admitted she did not like M.A. or her mother April.

Rachel's daughter Jasmine testified that she sometimes slept in the same room as M.A. and S.L. Jasmine believed M.A. hated defendant, and stated M.A. was very upset at a family party when her mother and defendant flirted and kissed.

Defendant also called two psychologists to testify on his behalf. Clinical psychologist William O'Donohue opined that a delay in reporting did not mean an

allegation of sexual abuse was true or untrue. Psychologist Donald Siggins evaluated defendant and found that he did not exhibit the characteristics of a pedophile.

The jury found defendant not guilty of count 1 and it deadlocked on count 4; the jury found defendant guilty of counts 2, 3, and 5. The court declared a mistrial on count 4, and granted the prosecutor's motion to dismiss the count.

The court sentenced defendant to a determinate term of 10 years in state prison, which included eight years for count 3 and two years for count 5, plus an indeterminate term of 15 years to life on count 2. Defendant timely appealed.

DISCUSSION

I

*CALCRIM No. 1193*

The trial court instructed the jury with CALCRIM No. 1193 as follows: "You have heard testimony from Dr. Anthony Urquiza and Dr. William O'Donohue regarding child sexual abuse accommodation syndrome. Dr. Anthony Urquiza's and Dr. William O'Donohue's testimony about child sexual abuse is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not [M.A.'s] conduct was not inconsistent with the conduct of someone who has been molested, *and in evaluating the believability of her testimony*." (Italics added.)

Defendant contends the trial court erred in giving CALCRIM No. 1193 because the instruction allowed jurors to consider child sexual abuse accommodation syndrome evidence for the improper purpose of determining whether M.A.'s allegations were true. In other words, it erroneously allowed the jury to apply the expert's testimony case-specifically to evaluate the believability of M.A. at trial.

Defendant notes the predecessor instruction, CALJIC No. 10.64, did not include the phrase about "evaluating the believability" of the victim's testimony. He claims this phrase violates the legal principle that child sexual abuse accommodation syndrome

9

evidence may not be used to determine whether the victim is telling the truth or to corroborate the victim's claims. We disagree.

The phrase defendant challenges correctly stated the law. Child sexual abuse accommodation syndrome evidence is properly used to help the jury evaluate credibility, i.e., the believability of the victim's testimony. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 [recognizing expert testimony regarding child sexual abuse accommodation syndrome is admissible to rehabilitate the complaining witness when the defendant impeaches her credibility]; *People v. Munch* (2020) 52 Cal.App.5th 464, 466 [recognizing that "reasoning of *McAlpin* is as valid today as it was in 1991 . . . ."])

Defendant improperly isolates a single phrase in the instruction rather than considering the instruction as a whole. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1074-1075 [correctness of jury instructions determined from the entire set of instructions, not just an isolated part of an instruction].) CALCRIM No. 1193 as a whole told jurors that child sexual abuse accommodation syndrome evidence was not evidence defendant committed the crimes. Nothing in the italicized portion of the instruction about evaluating the alleged victim's believability contradicted the former. The trial court, moreover, instructed the jury on the presumption of innocence, the People's burden to prove the allegations beyond a reasonable doubt, and how to evaluate the credibility of witnesses. We presume the jurors followed the court's instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852 ["Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions"].)

In accordance with CALCRIM No. 1193, Dr. Urquiza testified that it was not his role as a psychologist to determine whether an accusation of abuse was true, and he expressed no opinion on whether defendant had sexually abused M.A. He merely opined regarding commons myths and misconceptions about child sexual abuse victims, and noted that delaying in reporting or denying or recanting accusations are not necessarily inconsistent with a child who has been sexually abused. The jury instruction on child

10

sexual abuse accommodation syndrome, and the expert testimony on that topic were proper.  (See, e.g., *People v. Munch, supra*, 52 Cal.App.5th at pp. 467, 473-474 [trial court did not err in giving CALCRIM No. 1193 on child sexual abuse accommodation syndrome testimony; expert's testimony on characteristics of children who had been impacted by sexual abuse proper].)

## II

### *Abstract of Judgment*

The trial court sentenced defendant to a determinate term of 10 years, plus an indeterminate term of 15 years to life.  Defendant contends the indeterminate abstract of judgment erroneously checked Box 5, which indicates an additional term of life with the possibility of parole.  The People concede Box 5 on the indeterminate abstract of judgment form was checked in error.  After examining the record, we agree that the court did not impose an additional term of life with the possibility of parole at sentencing.

Appellate courts have the inherent power to correct clerical errors in a judgment at any time.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)  "Rendition of the judgment is normally an oral pronouncement, and the abstract of judgment cannot add to, or modify, the judgment, but only purports to digest and summarize it."  (*People v. Zackery* (2007) 147 Cal.App.4th 380, 389.)  "Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls."  (*Id.* at p. 385.)  We shall therefore direct the clerk to correct the abstract of judgment accordingly.

### DISPOSITION

The judgment is affirmed.  The clerk of the court is directed to delete the check mark from Box 5 on the indeterminate abstract of judgment, and to forward a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.

_____/s/_____
BLEASE, Acting P. J.

We concur:

_____/s/_____
DUARTE, J.

_____/s/_____
RENNER, J.